2024 IL App (1st) 221365-U

No. 1-22-1365

Order filed March 29, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| SUSAN PROFFITT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Appeal from the |
| | ) | Circuit Court of |
| v. | ) | Cook County. |
| | ) | |
| DICKENS HUDSON CONDOMINIUM | ) | No. 17 L 1060 |
| ASSOCIATION, DICKENS HUDSON | ) | |
| CONDOMINIUM ASSOCIATION, and the BOARD OF | ) | Honorable |
| MANAGERS OF DICKENS HUDSON | ) | Thomas More Donnelly, |
| CONDOMINIUM ASSOCIATION, JOE MILLER, | ) | Judge, presiding. |
| ANDY WALLACE, BETH PARTYKA, ALLISON | ) | |
| WALLACE, MELISSA LEVY, SHIRLEY CHAN, | ) | |
| KYLE HAWKINS, and JACKIE KOESTERS, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices D.B. Walker and R. Van Tine concurred in the judgment.

**ORDER**

¶ 1   *Held*:   A jury returned a verdict on a five-count complaint, finding in favor of plaintiff on two counts, and in favor of defendants on three counts. The trial court entered judgment on the verdict and denied plaintiff's post-trial motion. The judgment of the trial court is affirmed.

¶ 2     In 1994, plaintiff Susan Proffitt purchased a condominium within a building operated by defendant Dickens Hudson Condominium Association (the Association). In 2000, plaintiff began complaining to the Association about problems with the temperature in her unit. She ultimately disconnected her radiators from the piping that was meant to supply her unit with steam heat produced by a boiler and ceased paying any assessments related to the boiler. The Association's Board of Directors (Board) initiated a forcible entry and detainer action against plaintiff, which was unsuccessful. Plaintiff then sued the Association for violating the Illinois Condominium Property Act, 765 ILCS 605/1 *et seq*. (the Act) and the Association's Declaration, and a number of past and present Board members for breach of fiduciary duty. The jury returned a verdict in favor of plaintiff on the counts directed at the Association, but in favor of the individual defendants.

¶ 3     For the reasons that follow, we affirm the judgment of the trial court.[1]

¶ 4                                    I. BACKGROUND

¶ 5                          A. Complaint and Pretrial Proceedings

¶ 6     On January 30, 2017, plaintiff sued the Association and a number of its past and present board members including Joe Miller, Andy Wallace, Beth Partyka, Allison Wallace, Melissa Carter,[2] Shirley Chan, Kyle Hawkins, and Jackie Koesters. The five-count complaint included two counts alleging that the Association violated the Act and Association's Declaration, respectively, based on a failure to properly maintain and repair the boiler in the condominium building. The third, fourth, and fifth counts alleged that individual members of the Association's Board of

_____

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] The complaint named Carter by her given name, Levy, but she was married by the time of trial.

Managers (Board) breached their fiduciary duty to plaintiff. Among the alleged breaches were the failure to properly repair the Building's boiler, wrongfully levying boiler assessments against plaintiff, and wrongfully prosecuting a forcible entry and detainer action against plaintiff.

¶ 7 Defendants filed multiple motions to dismiss based on section 2-619 of the Code of Civil Procedure, which resulted in the trial court ruling that plaintiff's claims against the Association were governed by a 10-year statute of limitations, while plaintiff's breach of fiduciary duty claims against the individual defendants were governed by a 5-year statute of limitations. This prompted plaintiff to amend her complaint and limit those breach of fiduciary duty claims to conduct between 2012 and 2017.

¶ 8 During discovery, plaintiff became aware of a letter written by an attorney, Michael Shifrin, on October 22, 2012, that contained legal advice given to the Board regarding the interpretation of the Association's declaration. Defendants refused to produce this letter, citing attorney-client privilege.

¶ 9 Prior to trial, plaintiff filed a number of motions *in limine* which included requests to bar evidence not previously disclosed or produced and bar undisclosed witnesses and undisclosed opinions. Plaintiff also sought to bar defendants' expert, Michael Kim, because defendants' disclosure failed to identify Kim's opinions and the bases for those opinions. Furthermore, plaintiff also claimed that Kim should be barred because defendants planned to elicit testimony from Kim that did not require specialized knowledge. Finally, plaintiff also sought to bar defendants from relying on evidence related to the advice of counsel unless defendants agreed to waive attorney-client privilege.

¶ 10    At the hearing on motions *in limine* on August 17, 2021, defendants agreed to waive the attorney-client privilege with respect to Shifrin's advice. When the trial court asked plaintiff's counsel for his position, he responded, "Well, if there's a waiver with respect to whatever they say they were relying upon so that I can cross-examine and ask about the nature of the advice, then I think that basically grants the motion." Afterwards, the trial court said, "I just want the record to be clear that the parties have no objection to Motion in Limine Number 3 with the understanding that the attorney-client privilege has been waived by the defendants as to the conversations his client had with the Attorney Michael Shifrin." Plaintiff's counsel expressed no other objection to the letter from Shifrin at that time.

¶ 11    The same day, the trial court barred defendant's expert, Kim, from testifying on the basis that his proffered opinions did not require scientific or technical knowledge and that defendant's disclosures did not comply with Supreme Court Rule 213. The trial court agreed with plaintiff and barred Kim from testifying.

¶ 12    On November 23, 2021, defendants filed a motion asking the trial court to bar plaintiff's expert Evan McKenzie from testifying at trial or, alternatively, reconsider its previous order barring Kim from testifying. The trial court denied the motion to bar McKenzie, but reconsidered its previous order and ruled that Kim would be permitted to testify at trial.

¶ 13    On February 3, 2022, defense counsel provided an email to plaintiff's counsel and the trial court setting out the proposed trial exhibits, noting that plaintiff had an objection to Defendant's Exhibit 1, which was the advice letter written by Shifrin. That email demonstrated that the letter from Shifrin was disclosed at least as early as February 3, 2022. Between February 3, 2022, and

May 17, 2022, when trial began, the record reflects that plaintiff filed no motions or otherwise raised any issues regarding the admissibility of Shifrin's letter or its contents.

¶ 14                                    B. Trial

¶ 15              1. Evidence Regarding Inadequate Heat and the Building's Boiler

¶ 16    Plaintiff moved into her condominium unit in the building at 2103 North Hudson in 1994. The building contained 12 units, 8 of which were heated by way of a boiler connected to radiators. The four ground-floor units were heated by a separate system unrelated to the boiler. Plaintiff's unit was one of those connected to the boiler. The Association's Declaration listed the building's boiler as one of the common elements for which the Association was responsible for the costs of maintaining those common elements. Multiple defendants acknowledged that the maintenance and repair of common elements such as the boiler was the Board's responsibility.

¶ 17    Plaintiff served on the Board between 1995 and 2000. Her problems heating her unit using the built-in radiator system began in 2000, which was around the time that the building switched its boiler maintenance company to Williams Stoker Heating Company (Stoker). Plaintiff testified that between 2000 and 2007, the building's boiler constantly failed to heat her unit, and only occasionally worked as intended. It was frequently below 66 degrees in the winter in plaintiff's unit without relying on space heaters to heat her unit. However, she was afraid to leave the space heaters on during the day while she was at work, so her unit was always cold when she arrived home. During this period, plaintiff complained consistently about the heat, but her emails doing so were sent from a work account to which she lost access when she retired, and thus could not produce them.

¶ 18    Between 2007 and 2012, plaintiff sent "hundreds" of emails to the Board complaining about inadequate heat and continued to use space heaters to heat her unit. No one from the Board ever inspected plaintiff's unit or took any temperature readings, and the Board never asked a maintenance company to inspect plaintiff's unit. On May 23, 2010, the Board notified owners that it wished to issue a special assessment of $5,000 to perform boiler repairs. Plaintiff objected to the cost, which she claimed was a quarter of what it would cost to purchase an entirely new boiler. That repair did not resolve plaintiff's heating issues. On November 3, 2010, after the $5,000 repair took place, plaintiff emailed the Board to complain that her radiators were "ice cold." Several months later on February 7, 2011, plaintiff emailed the Board that there had been no heat in her unit for at least 24 hours and that it was 63 degrees in the unit. Plaintiff continued to have problems heating her unit throughout 2011 and chose to run for the Board in February 2012.

¶ 19    A March 16, 2012, email from defendant Partyka to plaintiff stated, "I am sorry if you do not like my position I have taken with the boiler, but we never cater to the whole building's budget to one unit's issue when there is nothing showing the issue is a building issue." Plaintiff responded, stating that she had not had consistent heat since February and that she would resign from the Board and continue to pay into the boiler fund. However, she stated she intended to disconnect from the boiler system in 2013. Plaintiff claimed her resignation was the result of her belief that the Board was breaking the law, though her testimony did not specify which laws were being broken.

¶ 20    The Board sent plaintiff an email on August 2, 2012, asking for information about how the work of disconnecting plaintiff's unit would be done, and how plaintiff was going to heat her unit. Plaintiff interpreted this email as permission to cap her radiators. Beth Partyka, one of the Board

members at the time, insisted that plaintiff use Stoker to cap her radiators. Plaintiff proceeded to hire Stoker to remove her radiators without providing a plan to the Board. Plaintiff claimed she never received any communications from the Board that she was not permitted to move forward with the work. Plaintiff ultimately disconnected her unit from the boiler sometime in August 2012.

¶ 21    Defendants presented evidence of numerous instances between 2009 and 2011 where plaintiff complained that her heat was not working, someone from the Board took corrective action, and plaintiff subsequently confirmed that her radiators were working. Defendants also presented evidence that they encouraged plaintiff to put in her storm windows and remove her air conditioner from her window during the winter.

¶ 22    Between October 25, 2012, and October 31, 2012, the Board held the first of two votes to determine whether the Association should amend the Declaration to allow plaintiff to disconnect from the boiler system. The unit owners voted by a two-thirds majority to allow plaintiff to disconnect from the boiler and to amend the Declaration. The Association then held a second vote on December 16, 2012, which reached the opposite conclusion. Plaintiff was not notified of either vote. Plaintiff later received a demand letter from attorney Shifrin stating that plaintiff owed money for unpaid boiler assessments. Plaintiff's own attorney responded refuting that assertion, and plaintiff heard nothing further of the matter until 2015 when the Board filed a forcible entry and detainer action against plaintiff to recover unpaid boiler assessments and plaintiff's share of a new boiler that was installed in 2015. Plaintiff ultimately prevailed in that action.

¶ 23    Testimony from Dittmar Schaefer, Stoker's owner, maintained that Stoker provided maintenance and repair services for the Building's boiler between 2005 and 2015. During that time, Stoker was contracted to perform routine, annual maintenance, as well as address a number

of non-scheduled issues that arose such as leaks. Schaefer had no opinion about whether the boiler was providing adequate heat between 2007 and 2012, and he stated that standard practice upon being informed of a particular unit not receiving adequate heat would be to inspect the unit. However, Stoker would only respond to requests for inspections or maintenance made by Board members rather than individual unit owners. None of Stoker's service records contained any references to complaints about inadequate heat in plaintiff's unit, and Schaefer agreed that no one ever notified Stoker that plaintiff's unit was receiving inadequate heat.

¶ 24     Daniel McJacobson, an engineer, testified that he reviewed a 2015 report from Fewer Boiler, Inc. that was created after an inspection of the building's boiler. The Fewer report concluded that the boiler's piping configuration was not done in accordance with standard industry practices and that over a number of years, tens of thousands of gallons of water had escaped the boiler system. This told Jacobson that the boiler system was not functioning as it was originally designed and provided a possible explanation why the system would not be capable of delivering heat. He opined that the Board failed to allow Stoker to implement an effective solution to the boiler's problems and failed to hire professionals capable of diagnosing and correcting the boiler's problems. On cross-examination, McJacobson acknowledged that plaintiff had removed a radiator from her kitchen in 2006 when she remodeled, and that such removal would reduce the total amount of heat that her unit could receive.

¶ 25     Defendants repeatedly testified to, and were cross-examined about, attorney Shifrin's October 22, 2012, advice letter. That letter advised the Board that the Association's Declaration did not permit the eight units connected to the boiler to disconnect from it at will, and that an amendment to the Declaration must be made before a unit owner could modify their use of the

common elements. The letter advised that the Board was obligated as part of its fiduciary duty to the unit owners to continue collecting boiler assessments from plaintiff and pursue necessary legal action, if necessary, to collect any unpaid assessments. The letter did not reference any communications between the Board and plaintiff, or plaintiff's repeated complaints about inadequate heat.

¶ 26    Between 2007 and 2012, plaintiff paid $5,700 in boiler expenses while receiving heating that was, according to her, "far from reliable," and she was frequently freezing as she waited for space heaters to heat up her unit. In 2007, plaintiff's unit was estimated to be worth $256,000. By 2012, it was worth $235,000. The estimate for the rental value of her property between 2007 and 2012 ranged from $1,325 per month to $1,600 per month. However, those estimates were provided by a real estate expert who admitted she did not collect any of the data herself, and was using someone else's report. She could not say to a degree of reasonable certainty that the estimated values for plaintiff's unit represented fair market value.

¶ 27                            2. Testimony of Condominium Law Experts

¶ 28    Professor Evan McKenzie, the head of the political science department at the University of Illinois at Chicago (UIC), and a faculty member of UIC's law school, testified that condominium officers and directors have a fiduciary duty to manage their condominium association in a professional, competent, and fair manner and to be open and honest in their dealings. In doing so, an association must exercise sound business judgment, which requires the making of informed, intelligent, and competent business decisions.

¶ 29    McKenzie developed four separate opinions in this case. His first opinion was that the Association, through its directors, did a "substandard job of seeing to it that [plaintiff's] unit was

heated adequately." He stated that the proper standard of practice dealing with plaintiff's complaints would be to investigate, determine the scope of the problem, and if necessary, involve contractors and experts. McKenzie believed the Association made an inadequate effort to document the problem with plaintiff's heat and determine the cause and severity of the problem. He saw only one instance of someone on the Board going to plaintiff's unit to take a temperature reading.

¶ 30    McKenzie specifically referenced the email from Partyka to plaintiff which stated that the Board would not cater the building's budget to an issue facing only a single owner. He explained that this position demonstrated a clear misunderstanding of the Board's obligations because the Board owed a duty to each and every individual owner, and that duty could not be alleviated simply because other owners were not facing the same issue. He specifically stated that Partyka's actions fell below industry standards.

¶ 31    McKenzie's second opinion was that the Association repeatedly dealt with plaintiff in bad faith when it had an obligation to behave ethically. He specifically cited the fact that the Board had apparently given plaintiff permission to disconnect her unit from the boiler when it asked for details about plaintiff's plan to do so, and then reneged on that permission when it demanded that plaintiff reconnect to the boiler system.

¶ 32    Next, McKenzie opined that the Association fell below industry standards when it held multiple votes regarding plaintiff's desire to disconnect from the boiler system and intentionally excluded plaintiff. He noted that it was especially remarkable that attorney Shifrin's demand letter to plaintiff made no mention of the fact that plaintiff had permission to disconnect her unit, or that two-thirds of unit owners had voted to allow plaintiff to disconnect from the boiler and amend the

declaration. Then, after attorney Shifrin's involvement, the Association held a "redo" vote. McKenzie stated that industry standards do not permit having repeated votes until the Board obtained the outcome it desired.

¶ 33 Finally, McKenzie opined that the eviction action against plaintiff was initiated in bad faith and that industry standards maintain that litigation by a condominium association against an owner should be a last resort because it creates conflict and disrupts community. He maintained that the lawsuit was unnecessary and never should have been filed.

¶ 34 McKenzie admitted that he did not interview any of the parties, and could not identify any times when plaintiff complained about the heat and the Board failed to take action. In his words, "I didn't try to match up her complaints with their responses, so I just — I just went off the emails." He also admitted that he disagreed with plaintiff's assertion that she did not need permission to disconnect from the boiler. Instead, he agreed with defense counsel that owners need to vote to amend the declaration to permit someone to be removed from the boiler.

¶ 35 Kim opined that the Association acted appropriately regarding plaintiff's complaints between 2007 and 2012 and that he did not see any reliable evidence that showed plaintiff's unit endured unreasonable periods of inadequate heat between 2007 and 2012. Kim also opined that the Board acted reasonably in its maintenance of the boiler system between 2007 and 2012, and that the Board acted appropriately in deciding to repair the boiler between 2010 and 2012 rather than replace it. Additionally, he opined that the Board's actions, particularly with regard to assessing boiler expenses to plaintiff between 2007 and 2012, were consistent with the Association's declaration and the Act. He also saw no evidence that the Board refused to address plaintiff's complaints of inadequate heat. Furthermore, he opined that the Association did not

breach its fiduciary duty to plaintiff, particularly when it excluded plaintiff from the votes about disconnecting her unit and when it refused to allow plaintiff to disconnect her unit from the boiler. He further opined that the Board did not authorize plaintiff to disconnect from the boiler and that the Board acted appropriately by relying on the advice from counsel and by excluding plaintiff from the votes. Finally, Kim opined that the Board did not breach its fiduciary duty by assessing boiler expenses between 2012 and 2016 and by pursuing the forcible entry and detainer action against plaintiff. On cross-examination, Kim admitted that the Board's decision to initiate the forcible entry and detainer action without a vote from all unit owners was contrary to "the statute," but did not specify which statute.

¶ 36                            3. Verdict and Posttrial

¶ 37    The jury returned a verdict in favor of plaintiff on Counts I and II, and in favor of defendants on the remaining counts. On Count I, the jury awarded $10,000 for pain and suffering; and $5,000 for emotional distress. On both Count I and Count II, the jury awarded $3,000 for boiler expenses and special assessments related to the boiler between January 30, 2007, and August 30, 2012, and $4,500 for loss of use of the condominium between January 30, 2007, and August 30, 2012. The trial court subsequently reduced plaintiff's award by $7,500, finding that the damages for boiler assessments and loss of use in Counts I and II were duplicative.

¶ 38    Plaintiff's posttrial motion was denied, and this appeal followed. Defendants did not cross-appeal the judgment as to Counts I and II.

¶ 39                             II. ANALYSIS

¶ 40    On appeal plaintiff claims that the trial court erred by: (1) admitting Michael Shifrin's advice letter and testimony regarding it; (2) improperly instructing the jury about the business

judgment rule; (3) allowing Michael Kim to testify; (4) precluding plaintiff from seeking past legal expenses as damages; (5) reducing plaintiff's award by $7,500; and (6) not granting plaintiff a new trial or granting judgment n.o.v. on Counts III, IV, and V.

¶ 41    We address these issues in turn.

¶ 42                        A. Admission of Legal Opinion Letter

¶ 43    Plaintiff first argues that defendants committed "gross misconduct" and that the trial court erred by allowing testimony at trial regarding Shifrin's advice letter. Plaintiff frames this issue as a violation of the requirements of Supreme Court Rules 213(f) and 201(n) and that defendants' use of the letter amounted to unfair surprise.

¶ 44    Neither plaintiff's contemporaneous objection at trial regarding the letter, nor her post-trial motion, invoked Rule 213(f). Instead, the objection was that the letter was untimely disclosed and the post-trial motion claimed that the letter was improperly admitted into evidence. Plaintiff raises her Rule 213(f) argument for the first time on appeal, and thus this part of the argument is forfeited. See Ill. S. Ct. R. 366(b)(2)(iii). Although defendants have not argued that plaintiff forfeited this issue, we may consider the issue of forfeiture *sua sponte*. *See People v. Smith*, 228 Ill. 2d 95, 106 (2008) ("[T]he ascertainment of its own jurisdiction is one of the two most important tasks of an appellate court panel when beginning review of a case. The other is to determine which issue or issues, if any, have been forfeited.").

¶ 45    In any event, Rule 213(f) is concerned with the disclosure of the identity of fact and opinion witnesses who will testify at trial and the substance of their testimony. Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2018). Shifrin did not testify, nor does the record indicate that defendants ever intended, attempted, or desired to call him as a witness. Thus, Rule 213(f) is inapplicable to this issue.

¶ 46    Plaintiff also argues that the supposed untimely disclosure violated Rule 201(n) on the basis that the rule "requires any document withheld on the basis of privilege to be identified in a privilege log in the form required by the rule." But Rule 201(n) says nothing about a privilege log. Instead, it states, "When information or documents are withheld from disclosure or discovery on a claim that they are privileged pursuant to a common law or statutory privilege, any such claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced or disclosed and the exact privilege which is being claimed." Ill. S. Ct. R. 201(n) (eff. July 1, 2014); *see also Thomas v. Page*, 361 Ill. App. 3d 484, 498 (2005) (Rule 201(n) does not necessarily require the preparation of a privilege log; it is enough to disclose who authored, sent, or received the document and the nature of the document).

¶ 47    Shifrin's letter was identified during discovery and defendant Carter testified that the letter concerned advice given to the Board regarding the interpretation of the Association's declaration. Even disregarding defendants' disclosure of the nature of the letter, defendants ultimately waived attorney-client privilege and disclosed Shifrin's letter three months before trial, and plaintiff has not explained how defendants' supposedly-insufficient compliance with Rule 201(n) mattered once defendants waived the privilege and tendered the document.

¶ 48    Plaintiff insists that the failure to comply with this rule prejudiced plaintiff because the use of the letter was an unfair surprise. Until August 17, 2021, defendants asserted attorney-client privilege with regard to Shifrin's letter. However, at the hearing on motions *in limine* on August 17, 2021, defendants waived the privilege and it became clear that defendants intended to introduce some evidence of Shifrin's advice to the Board. When the trial court asked plaintiff's counsel for his position, rather than stating an objection, he responded, "Well, if there's a waiver with respect

to whatever they say they were relying upon so that I can cross-examine and ask about the nature of the advice, then I think that basically grants the motion."

¶ 49    The motion *in limine* hearing demonstrated that plaintiff initially got precisely what she wanted, which was not a complete bar on this evidence. Plaintiff's counsel agreed that being able to cross-examine defendants about the advice they received was a satisfactory solution. Moreover, the document merely clarified for the jury the defendants' theory of the case and explained why they took the actions that they did.

¶ 50    We are cognizant that the trial court granted plaintiff's seventh motion *in limine*, which was a three-sentence generic motion seeking to exclude evidence that had not yet been disclosed. But that motion was granted during the same hearing at which defendants waived attorney-client privilege with respect to Shifrin's letter; that letter could not have possibly been tendered in discovery until then. Neither party sought to clarify whether the trial court's ruling on the seventh motion *in limine* would bar Shifrin's letter. It appears plaintiff's counsel did not believe so, otherwise his amenability to cross-examining witnesses so long as the letter was produced made no sense. When defendants offered to waive attorney-client privilege, plaintiff's counsel could have responded that, depending on the trial court's ruling on the seventh motion *in limine*, it was too late and the evidence should not be admissible no matter what. But he did not do so.

¶ 51    Plaintiff insists that the use of this letter was manifestly unfair because he was not able to depose Shifrin, have access to Shifrin's file, or use the letter in his depositions of defendants. But there is nothing to indicate that plaintiff ever sought any of these things despite it being obvious that defendants intended to use the letter as part of their defense, especially once defendants tendered the letter as a trial exhibit. In the three and a half months between the disclosure of

Shifrin's letter and trial, plaintiff pursued no other motions related to Shifrin's letter, and only made a formal objection once trial was underway, arguing that the letter was not disclosed in a timely manner.

¶ 52    Ultimately, the trial court's decision whether to admit or exclude evidence usually involves a matter within the court's discretion and will be overturned only for an abuse of that discretion. *Browning v. Advocate Health and Hospital Corporation*, 2023 IL App (1st) 221430, ¶ 48. An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 53    The trial court recognized that Shifrin's letter was disclosed well in advance of trial, and plaintiff's claims that this letter resulted in immense prejudice are belied by the fact that plaintiff took no action after the letter was disclosed and the fact that plaintiff's counsel originally asked for nothing more than the ability to cross-examine defendants about the letter's contents.

¶ 54    Accordingly, the trial court did not abuse its discretion in allowing the admission of evidence regarding Shifrin's letter.

¶ 55                              B. The Business Judgment Rule

¶ 56    Plaintiff next contends that the trial court erred by allowing defendants' Instruction #22, which explained the business judgment rule. Plaintiff adopts the position that the instruction should have also included the language, "This privilege also does not apply if the managers of a condominium association fail to comply with the condominium declaration or with the Illinois Condominium Property Act."

¶ 57    Parties are entitled to have the jury instructed on the issues presented, the principles of law to be applied, and the necessary facts to be proved to support its verdict. *Powell v. Dean Foods Co.*, 2013 IL App (1st) 082513-B, ¶ 119 (*citing Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002)). The trial court has discretion to determine which instructions to give the jury and that determination will not be disturbed absent an abuse of that discretion. *Id.* (citing *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002)). Thus, we ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant. *Id*. The function of jury instructions is to convey to the jury the correct principles of law applicable to the submitted evidence and, as a result, jury instructions must state the law fairly and *distinctly* and must not mislead the jury or prejudice a party. (Emphasis in original.) *Id*. (citing *Dillon*, 199 Ill. 2d at 507).

¶ 58    However, when an applicable Illinois Pattern Instruction (IPI) does not exist or does not accurately state the law, the trial court may instruct the jury with an impartial non-IPI instruction. Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013); *Parikh v. Gilchrist*, 2017 IL App (1st) 160532, ¶ 33. The trial court's decision on whether to use a non-pattern instruction should not be disturbed absent an abuse of discretion. *Parikh*, 2017 IL App (1st) 160532, ¶ 33 (citing *People v. Hudson*, 222 Ill. 2d 392, 400 (2006)). Whether the trial court has abused its discretion will turn on whether the non-IPI instruction is an accurate, simple, brief, impartial, and nonargumentative statement of the law. *People v. Tompkins*, 2023 IL 127805, ¶ 42 (citing *People v. Bannister*, 232 Ill. 2d 52, 81 (2008)).

¶ 59    The instruction in question, given over plaintiff's objection, read:

The law recognizes that condominium association officers enjoy a privilege to use their business judgment and discretion when acting in the best interests of the condominium association. This is known as the business judgment rule.

The privilege does not apply where the conduct of condominium association officers and directors was unjustified, such as when the officers, directors, act solely out of self interest or act solely to harm the plaintiff.

The privilege does not apply to officers or directors of the condominium association who fail to exercise due care.

Thus, in order to prove that the individual defendants intentionally and unjustifiably breached their fiduciary duty to the plaintiff, the plaintiff must prove that the individual defendants acted solely out of self interest and/or solely to harm Susan Proffitt, or that they acted without due care.

¶ 60    Defendants' Instruction #22 was based on *Koehler v. Packer Group*, *Inc*., 2016 IL App (1st) 142767, which did not involve a condominium association or the Act. There, the trial court gave an instruction similar to defendants' Instruction #22, with the exception that it said "corporate officers," rather than "condominium association officers," and did not include the phrase, "or that they acted without due care." *Id*. ¶ 49.

¶ 61    The trial court also instructed the jury with a version of IPI Civil (2022) No. 60.01 that told jurors they could consider a violation of the Act as a factor in deciding whether defendants exercised due care. In order to determine if the trial court abused its discretion here, we first recite the legal principles related to fiduciary duties and the business judgment rule.

¶ 62    The business judgment rule permits a trier of fact to presume that a corporate board made its decisions on an informed basis, in good faith and in an honest belief that the actions taken are in the best interest of the company. *Boucher v. 111 East Chestnut Condominium, Inc.*, 2018 IL App (1st) 162233, ¶ 48. A plaintiff may overcome the presumption by presenting evidence that the defendants failed to inform themselves, prior to making the business decision, of all material information reasonably available to them. *Id*. Under the business judgment rule, absent evidence of bad faith, fraud, illegality, or gross overreaching, courts are not at liberty to interfere with the exercise of business judgment by corporate directors. *Davis v. Dyson*, 387 Ill. App. 3d 676, 694 (2008). The purpose of this rule is to protect directors who have been diligent and careful in performing their duties from being subjected to liability for honest mistakes of judgment. *Id*. However, it is a prerequisite to the application of the business judgment rule that directors exercise due care in carrying out their corporate duties. *Id*. If directors fail to exercise due care, then they may not use the business judgment rule as a shield for their conduct. *Id*.

¶ 63    All condominium association officers and board members become fiduciaries to some degree when they take office. *Wolinsky v. Kadison*, 114 Ill. App. 3d 527, 533 (1983) (*Wolinsky I*). The fiduciary duty owed by the board of directors of a condominium association requires that the board members act in a manner reasonably related to the exercise of that duty and the failure to do so results in liability for the board and its individual members. *Id*. 533-34. Thus, condominium board directors owe a fiduciary duty to members of their association. *Id*. As part of this fiduciary duty, directors are required to comply with procedures in the condominium bylaws as well as the strictures of the Act. *Id*. at 534. A violation of a statute or of organizational bylaws can constitute a breach of fiduciary duty. *Davis*, 387 Ill. App. 3d at 693; *Wolinsky*, 114 Ill. App. 3d at 534.

¶ 64    Plaintiff points to *Davis* as evidence that the business judgment rule cannot protect condominium officers when they violate the Act or the condominium's declaration, but plaintiff has misapprehended the procedural posture of *Davis*. *Davis* stated that violation of a statute or organizational bylaws can, indeed, constitute a breach of fiduciary duty. *Davis*, 387 Ill. App. 3d at 693. But the issue before *Davis* was whether a motion to dismiss was properly granted and whether the business judgment rule, as a matter of law, shielded the defendants from a claim that they violated the Act and the condominium's bylaws. *Id*. at 692-94. Ultimately, we held that plaintiffs had stated a cause of action for breach of fiduciary duty and that the business judgment rule did not bar the plaintiffs' suit at the pleading stage. *Id*. at 693, 696. We did not hold that the business judgment rule, as a matter of law, cannot be a defense to allegations such as those brought by plaintiff here.

¶ 65    Furthermore, as this court observed in *Wolinsky v. Kadison* (*Wolinsky II*), the business judgment rule has been applied as a defense to claims that a board's actions were not permitted under the condominium's declaration. *Wolinsky v. Kadison*, 2013 IL App (1st) 111186, ¶¶ 65-67 (citing *Carney v. Donley*, 261 Ill. App. 3d 1002 (1994) and *Goldberg v. Astor Plaza Condominium Ass'n*, 2012 IL App (1st) 110620, ¶ 65). Notably, in *Goldberg* we affirmed, holding that the board members did not breach their fiduciary duty when they determined that the declaration did not authorize them to pay for replacement windows and surrounding structures in part because the board had relied on legal advice before making that determination. *Goldberg*, 2012 IL App (1st) 110620, ¶ 65.

¶ 66    Certainly plaintiff was permitted to allege, as she did here, that a violation of the Act or the Declaration constituted a breach of fiduciary duty by a defendant or defendants. *Davis*, 387 Ill.

App. 3d at 693. But plaintiff's proposed language would have completely eliminated the business judgment rule as a defense and turned any violation of the Act or the Declaration into strict liability. That is not consistent with *Davis* or the other aforementioned precedent.

¶ 67 As we stated in *Davis*, the business judgment rule protects directors from liability for honest mistakes. *Davis*, 387 Ill. App. 3d at 694. A prerequisite of the application of the business judgment rule is that directors exercise due care in carrying out their duties. *Id.* The trial court's instruction accurately conveyed the law. But the language plaintiff insists was appropriate would have gone too far and would have misstated the law.

¶ 68 Accordingly, the trial court did not abuse its discretion in giving this instruction.

¶ 69 C. Admission of the Testimony of Michael Kim

¶ 70 Pretrial, plaintiff moved to bar Kim's testimony on the basis that defendants' Rule 213(f) disclosures were nothing more than conclusory statements with no bases—no technical knowledge or expertise—accompanying them. The trial court initially agreed. Defendants then sought to bar plaintiff's expert, McKenzie, from testifying on the same basis or, alternatively, asked the trial court to reconsider its order barring Kim. Ultimately the trial court reversed itself and permitted Kim to testify. Plaintiff now argues on appeal that exclusion of Kim was appropriate based on the insufficiency of defendants' Rule 213 disclosures, and that the trial court erred in permitting Kim to testify.

¶ 71 Supreme Court Rule 213(f)(3) sets out that a party offering a controlled expert witness must disclose: (1) the subject matter on which the witness will testify; (2) the conclusions and opinions of the witness and the bases therefor; (3) the qualifications of the witness; and (4) any reports prepared by the witness about the case. Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018).

¶ 72 Rule 213 furthers the administration of justice by providing a degree of certainty in the trial process and eliminating a trial by ambush. *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 381 (2003). It permits litigants to rely on the disclosed opinions of opposing experts and construct their trial strategy accordingly. *Sullivan v. Edward Hosp.*, 209 Ill. 2d 100, 109 (2004). A party's Rule 213 disclosures must "drop down to specifics." *Id*. The supreme court rules represent the "best efforts to manage the complex and important process of discovery." *Id*. One of the purposes of Rule 213 is to avoid surprise. *Id*. Permitting either side to ignore Rule 213's plain language defeats its purpose and encourages tactical gamesmanship. *Id*. 109-10. As a result, expert testimony may be barred where there is inadequate disclosure of all opinions and the bases therefor. *Petre v. Kucich*, 331 Ill. App. 3d 935, 946 (2002). The admission of evidence pursuant to Rule 213 is within the sound discretion of the trial court, and the court's ruling will not be disturbed absent an abuse of discretion. *Sullivan*, 209 Ill. 2d at 109.

¶ 73 On their face, defendants' disclosures regarding Kim do not satisfy the requirements of Rule 213(f)(3). Defendants disclosed a list of 14 items about which Kim would testify at trial. Without exception, each item in the list began with "Based on" followed by some combination of "the deposition testimony," "records concerning the repairs and maintenance of the boiler system," "relevant email correspondence," and "advice of counsel." An opinion followed each of these prefatory phrases. None of these opinions were accompanied by any sort of explanation or basis. Furthermore, many of Kim's opinions clearly did not require specialized or technical knowledge.

¶ 74 For example, Kim opined that the Board "acted appropriately" regarding plaintiff's complaints about inadequate heat or "acted appropriately" in maintaining the boiler. These opinions, and multiple others, might be capable of being supported by specialized knowledge. But

in Kim's case, they were not. Kim's disclosed opinions were nothing more than conclusory statements with no explanation or support.

¶ 75    Some of Kim's opinions were also nothing more than his opinions about the veracity of the evidence. For example, Kim opined that the Board "did not refuse to address plaintiff's complaints regarding the heating of her unit on the basis that other units or a majority of units were receiving adequate heat." This opinion was clearly nothing more than a subjective personal opinion that resolved a factual dispute in defendants' favor. Likewise, Kim opined that the Board did not authorize plaintiff to disconnect her unit from the boiler, which was another instance of Kim offering an opinion about what factually transpired in this case. Kim's opinion that he saw "no reliable evidence" that plaintiff's unit had inadequate heat between 2007 and 2012 was also a comment on a factual dispute. Given that the evidence about plaintiff's lack of heat came from her testimony and emails, Kim's opinion amounted to little more than a comment on plaintiff's credibility.

¶ 76    We cannot say that defendants' disclosures or content complied with Rule 213(f)(3). However, whether the exclusion of a witness is a proper sanction for nondisclosure, a court must consider: (1) the surprise to the adverse party; (2) the prejudicial effect of the testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timely objection to the testimony; and (6) the good faith of the party calling the witness. *Sullivan*, 209 Ill. 2d at 110. The decision whether or not to impose sanctions lies within the sound discretion of the trial court, and that decision will not be reversed absent an abuse of discretion. *Id.*

¶ 77    We can compare the facts of this case to *Sullivan*. There, the plaintiff presented the testimony of a medical doctor who offered an opinion that was not included at all in plaintiff's

Rule 213 disclosures. *Id.* at 111. The supreme court observed that the defendant was "clearly surprised" by the testimony, and that the prejudice was manifest because it allowed the plaintiff to offer a theory of negligence that was previously unknown to the defendant. *Id.* Thus, the supreme court held that the trial court did not abuse its discretion in striking that portion of the doctor's testimony. *Id.*

¶ 78    By comparison, we believe Kim's testimony did not prejudice plaintiff to the extent that a new trial is warranted because any error in allowing him to testify was harmless. We note that plaintiff was diligent and timely in objecting to Kim's testimony prior to trial, and we cannot say defendants acted in bad faith as it fully disclosed the substance of Kim's testimony prior to trial, even if that substance was lacking under Rule 213. But the first three factors, particularly the second and third, are significant.

¶ 79    Importantly, unlike *Sullivan*, there was no surprise to plaintiff here. Kim's cumulative testimony conformed to defendants' disclosures and did not offer new or previously unknown opinions. Kim's trial testimony, like the Rule 213 disclosures, provided virtually no explanation for any of his opinions. On the occasions where he was asked to elaborate or provide an opinion or a basis that was not disclosed, the trial court sustained plaintiff's objections.

¶ 80    And unlike *Sullivan*, we cannot say that plaintiff suffered significant prejudice. In fact, Kim's opinions about whether the Board acted appropriately in the way it addressed plaintiff's complaints about heat or the actions it took to maintain the boiler would have applied equally to plaintiff's claims that the Association violated the Act or the Declaration. But the jury found in favor of plaintiff on those counts, thus demonstrating that Kim's conclusory opinions with no explanation, particularly when compared to McKenzie's detailed testimony, were not persuasive.

Furthermore, as we detail below in our discussion of the sufficiency of the evidence as to Counts III, IV, and V, there were other significant reasons independent of Kim's testimony why the jury could have found in favor of the individual defendants even without Kim's testimony.

¶ 81    Defendant's Rule 213(f)(3) disclosures failed to include any bases as required by the rule. However, considering the nature of the evidence as a whole, the possible prejudice to plaintiff, and the nature of the testimony, we cannot say that the trial court abused its discretion by permitting Kim to testify such that a new trial is warranted. Even if there was error, it was harmless and would not have led to a different outcome. *Hoffman v. Northeast Illinois Regional Commuter R.R. Corp.*, 2017 IL App (1st) 170537, ¶ 42 ("If we conclude that a properly conducted trial would not have led the jury to a different verdict, we will affirm").

¶ 82                              D. Attorney Fees as Damages

¶ 83    Plaintiff's fourth claim argues that the trial court erred by precluding plaintiff from seeking damages based on the attorney fees incurred by defending against the 2015 forcible entry and detainer action.

¶ 84    In Illinois, the American rule prohibits successful litigants from recovering litigation expenses in the absence of a statute or contractual agreement between the parties permitting recovery of such fees. *Goldstein v. DABS Asset Manager, Inc.*, 381 Ill. App. 3d 298, 302 (2008). This issue stems from an order entered by the trial court in response to defendants' motion to dismiss pursuant to section 2-615 of the Code of Civil Procedure, which we review *de novo*. 735 ILCS 5/2-615; *Bouton v. Bailie*, 2014 IL App (3d) 130406, ¶ 7.

¶ 85    In *Goldstein*, the plaintiffs sued for a preliminary injunction against defendant. *Goldstein*, 381 Ill. App. 3d at 299. Defendants filed a counterclaim against plaintiffs for breach of fiduciary

duty and that plaintiffs committed legal malpractice. *Id.* In their suit, defendants' Count I sought to recover the legal fees expended in defending against plaintiffs' suit as damages. *Id.* Notably, defendants cited plaintiffs' request for a preliminary injunction as the source of the fiduciary breach. *Id.* at 300. The trial court denied plaintiff's motion for a preliminary injunction, and then subsequently granted summary judgment in favor of plaintiffs for Count I of defendants' suit. *Id.* at 301.

¶ 86    We affirmed, reasoning that "the policy against awarding attorney fees was intended to apply only where a successful litigant seeks to recover his costs in maintaining the lawsuit," and that it was irrelevant whether defendants sought their attorney fees in a separate tort action. *Id.* at 303. As our supreme court said more than 80 years ago, "if the wrongful conduct of a defendant causing the plaintiff to sue him would give rise to an independent tort and a separate cause of action, there would be no end to the litigation, for immediately upon the entry of judgment the plaintiff would start another action against the defendant for his attorney fees and expenses incurred in obtaining the preceding judgment." *Ritter v. Ritter*, 381 Ill. 549, 555 (1943).

¶ 87    Plaintiff, however, insists that she is entitled to the fees expended in the forcible entry and detainer action based on *Nalivaika v. Murphy*, 120 Ill. App. 3d 773, 775 (1983). But *Nalivaika* is distinguishable. There, defendants contracted to sell their interest in a property to a third party. *Id.* at 774. Defendants subsequently refused to perform the contract and contracted with plaintiff to transfer ownership of the real estate. *Id.* Defendants represented to plaintiffs that the contract with the third party was null and void and that any issues with the third party had been settled or resolved. *Id.* The third party subsequently sued plaintiffs. *Id.*

¶ 88    In their subsequent suit against defendants, plaintiffs alleged damages in the form of legal fees because defendants' fraudulent misrepresentations precipitated plaintiffs' legal battle with the third party. *Id*. at 774-75. The trial court dismissed plaintiffs' complaint and we reversed, holding that the American rule was not applicable when the damages were incurred in litigation with a third party necessitated by defendants' wrongful actions. *Id*. at 775.

¶ 89    Plaintiff's situation is like that of *Goldstein*. The filing of the motion for a preliminary injunction by the plaintiffs there was like defendants' prosecution of the forcible entry and detainer action here. *Goldstein*, 381 Ill. App. 3d at 299. Likewise, defendants' attempt to recoup attorney fees in *Goldstein*, and the claim that plaintiffs' actions constituted a breach of fiduciary duty, is similar to plaintiffs' attempt here to recoup attorney fees based the argument that defendants breached their fiduciary duty by prosecuting the forcible entry and detainer action. *Id.* Unlike *Nalivaika*, however, this case does not involve damages that arose from the cost of litigation with a third party based on defendants' conduct. *Nalivaika*, 120 Ill. App. 3d at 774-75.

¶ 90    *Nalivaika* carved out a specific exception from the American rule where a litigant can recover the costs of litigation, but it is factually distinguishable and cannot be extended to the case at bar. Plaintiff's case sits squarely within the American rule, and there was no error in precluding plaintiff from claiming her litigation expenses as damages.

¶ 91                              E. Double Recovery on Counts I and II

¶ 92    Plaintiff next argues that the trial court erred by reducing the damages awarded to plaintiff by the jury by $7,500 based on duplicative jury verdicts.

¶ 93    Illinois public policy prohibits double recovery. *Federal Ins. Co. v. Binney & Smith, Inc.*, 393 Ill. App. 3d 277, 296 (2009). For one injury, there should only be one recovery irrespective of the availability of multiple remedies and actions. *Id*.

¶ 94    Here, plaintiff had multiple theories of recovery: Count I sought damages for the Association's violation of the Act, while Count II sought damages for the Association's breach of its Declaration. On Count I, the jury returned a verdict in favor of plaintiff and itemized damages as follows: (1) $10,000 for pain and suffering; (2) $5,000 for emotional distress; (3) $3,000 for boiler expenses and special assessments related to the boiler between January 30, 2007, and August 30, 2012; and (4) $4,500 for loss of use of the condominium between January 30, 2007, and August 30, 2012. For Count II, the jury also returned a verdict in favor of plaintiff and awarded the following itemized damages: (1) $3,000 for boiler expenses and special assessments related to the boiler between January 30, 2007, and August 30, 2012, and (2) $4,500 for loss of use of the condominium between January 30, 2007, and August 30, 2012.

¶ 95    The two verdict forms itemized the same $3,000 in boiler expenses and $4,500 in loss of use of plaintiff's condominium for the same time period: January 30, 2007, to August 30, 2012. It made sense to include these damages on both verdict forms because plaintiff could have succeeded on Count I, but not Count II, or vice versa. But there were not two condominiums for which plaintiff suffered loss of use, nor were there two condominiums for which she was paying boiler assessments. Plaintiff paid one set of boiler assessments, and lost the use of only one condominium.

¶ 96    Plaintiff urges us to consider that the jury's intent was to split the damages between Count I and Count II because "the jury award [for assessments] was close to $6,000, the amount claimed

by plaintiff and documented by the Association's invoices." But to accept that logic would require us to believe that the jury intended to compensate plaintiff for boiler assessments in an amount that exceeded what she actually spent.[3] The jury's award for loss of use also militates against that conclusion because the jury's award, even combined across both counts, was an order of magnitude less than the combined estimated rental value of the unit for the relevant time period, which was over $100,000.

¶ 97    Nothing in the record conclusively establishes that the jury intended the awards in Count I and Count II to be separate. During the instruction conference on the verdict forms, defendants expressed concern that plaintiff's verdict forms for Counts I and II were confusing because they both had line items for the damages in question. The trial court agreed to use plaintiff's verdict forms, but specified that it would make adjustments as necessary. The trial court also offered to instruct the jury on this issue. We cannot fault the trial court for adjusting the damages award when plaintiff knew ahead of time that the trial court intended to do just that in the event of multiple damage awards for the same injury and plaintiff did not avail herself of the trial court's invitation to submit clarifying instructions.

¶ 98    We see no reason in the record to believe that the jury did anything other than answer the question of liability and damages on each count independently without regard to the other counts, as it was not instructed to do anything else.

¶ 99         F. Manifest Weight of the Evidence/Judgment Notwithstanding the Verdict

¶ 100   Finally, plaintiff argues that the jury's verdicts in favor of the individual defendants on Counts III, IV, and V, were against the manifest weight of the evidence and that plaintiff was

---

[3] Plaintiff testified she paid $5,700 in boiler assessments between 2007 and 2012.

entitled to judgment notwithstanding the verdict (judgment n.o.v.) or a new trial. In particular, she argues that the jury's verdicts were inconsistent given the fact that it found in favor of the plaintiff on Counts I and II. While true that the Association cannot possibly take action without conduct of individual Board members, we disagree that the verdicts were legally inconsistent.

¶ 101   A judgment n.o.v. is properly entered in those limited cases where all the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *McClure v. Owens Corning Fiberglass Corp.*, 188 Ill. 2d 102, 132 (1999); *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 504-05, 510 (1967); see also *People v. Rosochacki*, 41 Ill. 2d 483, 490 (1969) (although some evidence when viewed alone may seem substantial, "courts are to decide when weak evidence has so faded in the strong light of all of the proof that only one verdict is possible of rendition"). Judgment n.o.v. is not appropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented. *McClure*, 188 Ill. 2d at 132. A trial court cannot reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable. *Id.* Likewise, the appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way. *Id.*

¶ 102   "In a ruling on a motion for judgment notwithstanding the verdict, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather, it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). A judgment n.o.v. may not be granted

merely because a verdict is against the manifest weight of the evidence. *Id.* In fact, a court has no right to enter judgment n.o.v. if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome. *Id.* at 454. We review *de novo* a trial court's decision on a motion for judgment n.o.v. *McClure*, 188 Ill. 2d at 132.

¶ 103   Alternatively, a verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence. *Id.* It is not our function to reweigh the evidence or substitute our judgment for that of the jury. *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003).

¶ 104   With respect to plaintiff's argument of contradictory verdicts, the issue is a question of law that we review *de novo. Redmond v. Socha*, 216 Ill. 2d 622, 642 (2005). There are two types of inconsistent verdicts, the first being cases involving a single claim in which the single verdict is alleged to be internally inconsistent or inherently self-contradictory. *Id.* at 643. The second is when a party makes multiple claims and where a verdict as to one claim is alleged to be inconsistent with the verdict as to another. *Id.* However, courts exercise all reasonable presumptions in favor of the verdict or verdicts, which will not be found legally inconsistent unless absolutely irreconcilable. *Id.* Verdicts will not be considered irreconcilably inconsistent if supported by any reasonable hypothesis. *Id.* at 644.

¶ 105   We first briefly summarize the allegations in Counts III, IV, and V. Count III alleged that defendants Partyka and Allison Wallace violated their fiduciary duties by failing to properly repair and maintain the boiler, wrongfully requiring plaintiff to heat her own unit, and wrongfully

requiring plaintiff to pay boiler assessments. Count IV alleged that defendants Joe Miller, Andy Wallace, Kyle Hawkins, Jackie Koesters, Shirley Chan, and Melissa Levy violated their fiduciary duty to plaintiff by continuing to levy boiler assessments against plaintiff after she disconnected from the boiler, despite the Board's agreement that she could do so. And finally, Count V alleged that defendants Joe Miller, Andy Wallace, and Jackie Koesters breached their fiduciary duty to plaintiff by wrongfully attempting to collect boiler-related assessments from plaintiff even though they knew plaintiff was permitted to remove the radiators from her unit, wrongfully prosecuting a forcible entry and detainer action against plaintiff, and wrongfully attempting to collect assessments and late fees for those assessments that were already paid by plaintiff in 2016.

¶ 106   As noted earlier, these claims were limited to a 5-year statute of limitations, while Counts I and II could reach back to 2007.

¶ 107                                        1. Count III

¶ 108   Plaintiff's complaint was originally filed in January of 2017, which limited the issue to an examination of Partyka and Wallace's conduct from 2012 to 2017. Testimony at trial demonstrated that 2012 was the last year that Partyka and Wallace served on the Board, and plaintiff disconnected her unit from the boiler in August of 2012.

¶ 109   There was considerable trial testimony not only about plaintiff's complaints about inadequate heat, but also the Board's responses to those complaints including records of routine and non-routine maintenance of the boiler. The bulk of plaintiff's complaints about inadequate heat were made prior to 2012. In fact, it appears there was one complaint in mid-March 2012 about plaintiff's heat, but even plaintiff's own engineering expert, McJacobson, testified that he saw no complaints about inadequate heat after November 27, 2011. It is not our function to weigh the

evidence, and it is not contradictory to think that the jury found plaintiff's allegations on Count I and II, which encompassed the years dating back to 2007, more credible or persuasive, while believing that Partyka and Wallace's conduct between January 2012 and August 2012 did not rise to the level of breaching their fiduciary duty.

¶ 110  Accordingly, plaintiff is not entitled to a new trial or judgment n.o.v. based on the jury verdict's on Count III.

¶ 111                              2. Counts IV and V

¶ 112  Plaintiff undoubtedly construed her communications with the Board as permission to remove her radiators and disconnect herself from the boiler. But the jury heard testimony about the verbatim content of the emails in question, and that was a factual dispute for the jury to resolve. More importantly, plaintiff's own expert admitted under cross-examination that plaintiff could not unilaterally disconnect herself from the boiler and that the Association's Declaration needed to be amended first. There was also evidence of the advice of counsel upon which the Board relied, which maintained that the Board had a fiduciary duty to enforce the Declaration and continue to levy boiler assessments against plaintiff.

¶ 113  Given that evidence, we cannot say that the jury's verdict on Counts IV and V were against the manifest weight of the evidence or that the trial court should have granted judgment n.o.v. The jury could have concluded that defendants were entitled to pursue plaintiff for boiler assessments, and to take legal action to recoup those unpaid assessments. Furthermore, with respect to Count V, there was no evidence regarding plaintiff's claim that defendants attempted to collect assessments and late fees that plaintiff already paid in 2016.

¶ 114 These verdicts are also not contradictory with the verdicts on Count I and II. While there was some overlap in the allegations in these counts, namely Count II's allegations that the Association wrongfully sought boiler assessments from plaintiff after August 2012, there were also numerous allegations in Count II that had no overlap with Counts IV or V, and which stretched all the way back to 2007. The jury could have found in favor of plaintiff for Counts I and II based on entirely separate conduct other than what was alleged in Counts IV and V, which took place from 2012 forward.

¶ 115                                III. CONCLUSION

¶ 116 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 117 Affirmed.